IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

REBECCA LOPEZ-DUPREY            :

                                         :

   v.                           :   Civil Action No. DKC 23-2812

                                         :

MGM NATIONAL HARBOR, LLC      :

                                         :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this disability-based employment discrimination case is the motion for summary judgment filed by MGM National Harbor, LLC ("MGM" or "Defendant").  (ECF No. 60).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion for summary judgment will be granted in part and denied in part.

**I.   Background**

    **A.   Factual Background[1]**

In November 2016, Rebecca Lopez-Duprey ("Ms. Lopez-Duprey" or "Plaintiff") began working as a cocktail server at MGM National Harbor.  (ECF No. 60-2 ¶ 3).  At MGM, cocktail servers are represented by the UNITE HERE Local 25 union ("Union").  (*Id.*).  As a cocktail server, Ms. Lopez-Duprey occasionally took "Star Trainer" shifts, for which she would be paid double to train new

---

[1] The facts herein are undisputed unless otherwise noted.

hires.  (ECF Nos. 60-2 ¶ 12; 60-4, at 3).[2]  "Star Trainer" was not a job title, but rather a shift title.  (ECF Nos. 60-2 ¶ 12; 60-4, at 3).   The shifts were not available to employees with disciplinary actions in their file.  (ECF Nos. 60-2 ¶ 12; 60-4, at 5).

Ms. Lopez-Duprey, like other cocktail servers, was required to wear high heels as part of her work uniform.  (ECF Nos. 60-2 ¶ 7; 60-4, at 6-7).  The high heels, however, caused her considerable discomfort and would make her feet bleed.  (ECF No. 60-4, at 11).

On July 1, 2019, MGM sent a "Request for Information from Health Care Provider" to Ms. Lopez-Duprey's doctor stating:

> MGM NATIONAL HARBOR employs [Ms. Lopez-Duprey].   MGM NATIONAL HARBOR has recently been alerted to the possibility that [Ms. Lopez-Duprey] may suffer from a disability, as that term is defined by the Americans with Disabilities Act, as amended (the "ADA"). Your assistance is appreciated in providing information to assist the Company in determining whether the individual is entitled to a reasonable accommodation in employment and the nature of any such accommodations.
>
> Please review the employee's job description which is attached hereto, complete the questions contained in the medical certification form also attached hereto, and sign this form.

---

[2] Although the hourly pay doubled, "Star Trainer" shifts also evidently required the cocktail server to split tips with the new hire, resulting in potentially lower overall pay.  (ECF No. 60-4, at 4).   Ms. Lopez-Duprey explained that MGM was "pretty much begging other people because nobody wanted to be a star trainer anymore because of the tips split and stuff like that."  (*Id.*).

(ECF No. 60-3, at 124).  Ms. Lopez-Duprey then submitted a formal Request for Accommodation on July 20, 2019, followed by a doctor's note signed July 29, 2019, explaining that Ms. Lopez-Duprey "has severe equinus as well as achilles tendonitis" and she should "avoid wearing heels and wear good supportive shoes" instead, and the completed form dated August 2, 2019.  (ECF No. 60-3, at 118–21, 122, 125–29).  In the completed form, Ms. Lopez-Duprey's doctor reiterated that she suffers from equinus and Achilles tendonitis, stated that she is substantially limited in walking and standing, and indicated that the accommodations she required were to "avoid[] heels" and "wear[] good supportive shoes."  (*Id.* at 125–29).  On August 30, 2019, MGM granted Ms. Lopez-Duprey a "temporary accommodation" to "wear flats/good support shoes instead of heels."  (*Id.* at 136; ECF No. 60-2 ¶ 19).

Although none of Ms. Lopez-Duprey's ADA documentation mentioned sneakers or Skechers, (ECF Nos. 60-2 ¶ 19; 60-4, at 20), she contends that she brought in a pair of Skechers brand tennis shoes to her supervisor and the Beverage Manager at the time, Janae Madric, who said "okay" when she saw them, (ECF No. 60-4, at 13).  Ms. Lopez-Duprey states that she decided to wear these Skechers because that is the pair of shoes she discussed with her doctor.  (*Id.* at 20).  Brian Morgan, who worked with Ms. Lopez-Duprey on her 2019 accommodation, stated on May 3, 2022, that whenever a

cocktail server makes a request to wear flat shoes, "they are typically expected to wear a flat dress shoe that is . . . not [a] sneaker[].  We would never grant approval for an employee to wear brand specific shoes like [Skechers] unless that was specifically requested from her doctor to be able to wear sneakers."  (ECF No. 60-3, at 175).  Ms. Lopez-Duprey wore the black mesh-top Skechers sneakers for the following two years.  (*See* ECF Nos. 60-2 ¶¶ 21, 23; 60-4, at 15).

In June 2021, Cami Johnson replaced Ms. Madric as the new Beverage Manager and, several months later, MGM hired Joe Farruggio as its new Beverage Director.  (ECF No. 60-2 ¶ 22).  On December 15, 2021, the Beverage Department held a potluck event, to which Ms. Lopez-Duprey wore her black Skechers sneakers.  (*Id.* ¶ 23).  At the potluck, some members of Ms. Lopez-Duprey's management team approached her about her footwear.  (*Id.*).  She informed them of her accommodation, (*id.*), and contends that Mr. Farruggio told her she had no accommodation, (ECF No. 60-4, at 16).  The following day, Ms. Lopez-Duprey sent an email to Ms. Johnson and Mr. Farruggio with several documents supporting her accommodation attached.  (ECF No. 60-2 ¶ 24).  Ms. Johnson responded to her email the same day, stating: "I now have the accommodation approval for you from 2019 for flats, not a sneaker-like shoe[].  You are

4

permitted to wear flat dress shoes, not a sneaker-like shoe." (ECF No. 60-3, at 138).

MGM posted a Shoe Standards Reminder ("Reminder") for beverage employees in the service bars on December 20, 2021, and an updated version on December 27, 2021. (ECF Nos. 60-2 ¶¶ 27-28; 60-3, at 106). The Reminder stated that casino servers are required to wear one- to three-inch heels and the "[s]hoes that are not approved are: Ballerinas, Birkenstocks, bedroom slippers, wedge heels, flip flops, sling backs, crocs, any slipper style, sneakers, tennis shoes or shoes with excessive strapping or ornamentation." (ECF Nos. 60-2 ¶ 28; 60-3, at 106).[3] The Reminder also provided images of approved shoes, including non-heeled shoes for employees with ADA accommodations. (ECF Nos. 60-2 ¶ 28; 60-3, at 106). Finally, the Reminder instructed beverage employees with ADA accommodations to have compliant shoes by January 10, 2022, and explained that "[f]ailure to adhere to the appearance

---

[3] The Reminder reflected the MGM Appearance Standards Policy then in place, which required that footwear "present a business-like appearance" and prohibited sneakers and tennis shoes (unless part of a uniform). (ECF No. 60-3, at 104). Ms. Lopez-Duprey contended in her deposition that this policy had changed since she started working for MGM. (ECF No. 60-4, at 9). The record evidence supports that contention: Looking at her training history, she was trained on a "New Appearance Standards Policy" in October 2020. (ECF No. 60-3, at 85). It is unclear whether the previous policy that was in place when her accommodation was granted in 2019 differed in any material way. Regardless, she does not appear to dispute that the updated policy governed in December 2021 and onward.

standards may result in disciplinary action up to and including separation." (ECF No. 60-3, at 106).

Ms. Lopez-Duprey continued to wear black Skechers sneakers while working. (ECF No. 60-2 ¶ 30). She alleges that, sometime between June 2021 and March 2022, she "was demoted from a Star Trainer . . . to a server." (ECF No. 1 ¶ 56). MGM disputes this characterization, positing that there was no Star Trainer *position* (as opposed to shift) from which Ms. Lopez-Duprey could be demoted and arguing that she did not substantiate this allegation with any evidence. (ECF No. 60-1, at 16). She further asserted that Ms. Johnson told her not to apply for a job in "High Limits," the casino's VIP area, because she would be required to wear high heels there. (ECF No. 1 ¶ 57; ECF No. 60-4, at 36). Ms. Lopez-Duprey did not submit an application to "High Limits." (ECF No. 60-2 ¶ 15). Finally, she alleges that "MGM [employees] also embarrassed her in front of coworkers and customers by chasing her around the casino to inquire about her accommodation requests, mocked her with insulting comments such as 'you aren't crippled,' and required her to wear a uniform with holes in it subjecting her to unwanted sexual attention from customers." (ECF Nos. 1 ¶ 122; 60-4, at 27-28). MGM disputes these allegations. (ECF No. 60-1, at 17, 20). When asked about being required to wear a dress with holes in it, Ms. Lopez-Duprey confirmed that that "had nothing to do with [her]

shoes" and was instead an example of "Cami [Johnson] being mean." (ECF No. 60-4, at 28).

Management met with Ms. Lopez-Duprey on multiple occasions in early 2022.  On January 26, 2022, Ms. Lopez-Duprey met with Ryan Mulholland, a Labor Relations Partner for MGM at the time, and Linda Martin, the Union President at the time.  (ECF Nos. 60-2 ¶ 33; 60-3, at 158).  They discussed the shoe accommodation and Mr. Mulholland said he would look into it.  (ECF Nos. 60-2 ¶ 33; 60-3, at 158).  Another meeting occurred on February 2, 2022, where Mr. Mulholland, Mr. Farruggio, Ms. Johnson, Ms. Martin, and Ms. Lopez-Duprey were present.  (ECF Nos. 60-2 ¶ 34; 60-3, at 160).  The meeting notes indicate that both Mr. Farruggio and Ms. Johnson apologized to Ms. Lopez-Duprey, that Mr. Mulholland offered that Ms. Johnson could help Ms. Lopez-Duprey pick out compliant shoes, and that they would give Ms. Lopez-Duprey the opportunity to have her doctor look at the shoes they select.  (ECF No. 60-3, at 160–61).  On March 4, 2022, another meeting took place, this time between Ms. Lopez-Duprey, Mr. Mulholland, Ms. Johnson, and Heather Kerr, a bartender and Shop Steward for the Union.  (ECF Nos. 60-2 ¶ 35; 60-3, at 167).  The meeting notes reflect that Ms. Lopez-Duprey said she had found shoes, but that she had not purchased them yet because they were somewhat expensive.  (ECF Nos. 60-2 ¶ 36; 60-3, at 167).  The notes further state that Ms. Johnson asked

Ms. Lopez-Duprey "what timeline [Ms. Lopez-Duprey] needs to get the correct shoes," to which Ms. Lopez-Duprey responded that she did not know. (ECF No. 60-3, at 168). Mr. Mulholland insisted on a "definitive timeline" and set the deadline as March 11, 2022. (ECF Nos. 60-2 ¶ 36; 60-3, at 168). The meeting notes state that Ms. Lopez-Duprey said "okay" to this deadline. (ECF No. 60-3, at 168). Possibly referring to this meeting, Ms. Kerr recounts that Mr. Mulholland insisted on a deadline for Ms. Lopez-Duprey to submit new ADA accommodation paperwork, and that Ms. Lopez-Duprey would not agree to a deadline until she visited her doctor. (ECF No. 64-2, at 1).

Ms. Lopez-Duprey continued to wear the black Skechers sneakers. She received a verbal warning for doing so on March 11, 2022, followed by written discipline on March 15, 16, and 17. (ECF Nos. 60-2 ¶ 42; 60-3, at 147–50). On March 21, she was placed on Working During Investigation ("WDI"), a process that MGM uses to investigate policy infractions and which can result in termination. (ECF Nos. 60-2 ¶ 39; 60-3, at 173). Ms. Lopez-Duprey stated that at the time she was placed on WDI, she already had a doctor's appointment scheduled for April 22, 2022. (ECF No. 60-4, at 40).

On April 22, 2022, Ms. Lopez-Duprey attended her doctor's appointment. Her doctor provided her with a note that said

"[p]atient has achilles tendonitis and equinus secondary to poor shoegear that has caused contracture of the patient's achilles tendon.    Please allow patient to wear previously approved [Skechers] like soft top shoes without a heel and/or similar style to them permanently due to patient's foot condition." (ECF No. 60-3, at 181).  Ms. Lopez-Duprey contends that she uploaded this note to Workday, MGM's employee portal, "[a]s soon as [she] received it," and provided copies of it to her managers, (ECF No. 60-4, at 41), but MGM maintains that it did not see the note until July 18, 2022, when Ms. Lopez-Duprey's Union representative forwarded the note to Mr. Mulholland, (ECF Nos. 60-2 ¶¶ 44, 46; 60-3, at 180).

On April 26, 2022, Ms. Lopez-Duprey commented on the disciplinary actions against her within Workday, stating:

> I am being forced to wear shoes against doctor[']s orders per Cami Johnson and Joe Far[r]uggio who claim I don't have an accommodation.  Cami Johnson and Janae Madric deleted my A[DA] documents from the system.  Cami Johnson began to harass and discipline me forcing me to wear shoes against my doctor[']s orders that were previously approved by Janae[.]  Then once I provided them proof I was still disciplined.

(ECF No. 60-3, at 147–50).

On May 12, 2022, Ms. Lopez-Duprey was terminated.  (ECF Nos. 60-2 ¶ 41; 60-3, at 177).  In the termination letter, MGM explained the cause:

9

> Separation for multiple violations of MGM
> National Harbor General Rules of Conduct
> including but not limited to:
>
> • GRC #40 — Violation of on-the-job rules,
> including rules, regulations and procedures of
> each department.
> • GRC #43 — Disregard or violation of company
> or departmental rules, procedures or
> polic[i]es.
> • Departmental appearance standards[.]
>
> Specifically, employee has been
> progressively disciplined for violating the
> company's appearance standards. The final
> incident occurred on March 21, 2022, when the
> employee wore shoes which violated the
> appearance standards.

(ECF Nos. 60-2 ¶ 41; 60-3, at 178).

Ms. Lopez-Duprey filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Civil Rights on May 14, 2022. (ECF No. 1-1). On July 27, 2023, the EEOC provided Ms. Lopez-Duprey a Notice of her Right to Sue. (ECF No. 1-2).

**B.   Procedural Background**

On October 18, 2023, Plaintiff Ms. Lopez-Duprey filed a complaint against Defendant MGM. (ECF No. 1). In the complaint, she asserts claims under the ADA and the Maryland Fair Employment Practices Act ("MFEPA") for failure to accommodate her disability (Counts I & II), disability discrimination (Counts III & IV), and retaliation (Counts V & VI). Defendant filed an answer on December 20, 2023. (ECF No. 12).

On May 9, 2024, Defendant filed a motion for summary judgment, arguing that Plaintiff should be judicially estopped from bringing any of her claims because she valued them at $0.00 in her pending bankruptcy petition.  (ECF No. 24).  Plaintiff filed a motion for partial summary judgment on Counts I and II, arguing that Defendant revoked her accommodation to wear Skechers sneakers in violation of the ADA and MFEPA.  (ECF No. 26).  Although some discovery had been conducted, the parties requested a stay of further discovery pending resolution of those motions.  (ECF Nos. 30; 31).  After reviewing the parties' motions, the court denied both on April 9, 2025.  (ECF Nos. 52; 53).  Defendant's motion failed because Plaintiff had since amended the valuation to "unknown" and listed the lawsuit as exempt property anyway.  (ECF No. 52, at 12).  Plaintiff's motion failed because "the evidence [wa]s conflicting as to what accommodation was permitted, whether the prior accommodation was altered, whether Plaintiff properly engaged in discussions, and when Defendant received the April 22, 2022 doctor's note, i.e., was it before July 22, 2022."  (*Id.* at 16).  Thereafter, discovery resumed.

On January 16, 2026, Defendant moved for summary judgment.  (ECF No. 60).  Plaintiff responded on February 13, (ECF No. 64), and Defendant replied on March 13, (ECF No. 65).

11

## II.   Standard of Review

Summary judgment is appropriate under Fed.R.Civ.P. 56(a) when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.   A fact is material if it "might affect the outcome of the suit under the governing law."  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011) (Shedd, J., dissenting)).   A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the burden of persuasion at trial would rest on the nonmoving party, the moving party may satisfy its initial burden of production by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Once the moving party has met that burden, the nonmoving party must "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting former Fed.R.Civ.P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment[.]"  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may

12

be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020) (citing *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010)). The "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

At the summary judgment stage of employment cases, the unique burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), sometimes applies. Here, *McDonnell Douglas* does not apply to the failure-to-accommodate claims, *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.2 (4th Cir. 2021), but it does apply to the disability discrimination and retaliation claims, *Perry v. Comput. Scis. Corp.*, 429 F.App'x 218, 219–20 (4th Cir. 2011) (per curiam) (citing, inter alia, *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc)). Under the burden-shifting framework, the plaintiff bears the burden of producing evidence that establishes a *prima facie* case of discrimination or retaliation. *Id.* at 220 (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff successfully does so,

13

"the burden shifts to the defendant to provide a legitimate, nondiscriminatory [or nonretaliatory] reason for its action." *Id.* (citing *Laber*, 438 F.3d at 432).  If the defendant produces evidence of such a reason, the plaintiff "must show by a preponderance of the evidence that the proffered reason was a pretext for discrimination or retaliation." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–48 (2000); *Laber*, 438 F.3d at 432).

## III. Analysis

As noted, Plaintiff asserts claims of failure to accommodate, disability discrimination, and retaliation, each under the ADA and the MFEPA.  The ADA mandates that no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Such discrimination can include failure to provide the employee a reasonable accommodation.  *See id.* § 12112(b)(5)(A).  The ADA further bars retaliation against an employee because that employee "has opposed any act or practice made unlawful" by the ADA.  *Id.* § 12203(a). The reasonable accommodation and discrimination provisions of the MFEPA, Md. Code Ann., State Gov't § 20-606(a)(1), (a)(4) (West

14

2026), are analogous to those of the ADA and are "evaluated under the same framework." *Corrigan v. Balt. Police Dep't*, No. 24-cv-3497-ELH, 2026 WL 73800, at *18 (D.Md. Jan. 9, 2026) (quoting *Teel v. Md. Nat. Treatment Sols., LLC*, No. 23-cv-1694-RDB, 2024 WL 1075421, at *4 (D.Md. Mar. 12, 2024)).  The same is true for the retaliation provision of the MFEPA, Md. Code Ann., State Gov't § 20-606(f).  *Gagnon v. Bd. of Educ.*, 760 F.Supp.3d 359, 375 (D.Md. 2024) (citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 482 & n.8 (2007); *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 391 (4th Cir. 2001)).

Defendant moves for summary judgment on all counts of the complaint.  Because Defendant has shown that there is no genuine dispute of material fact and it is entitled to judgment as a matter of law on all but part of Counts III and IV, its motion for summary judgment will be granted in part and denied in part.

A.   **Failure-to-Accommodate Claims (Counts I & II)**

"To show an employer's failure to accommodate, the Plaintiff must prove: (1) that she had a disability within the statutory meaning; (2) that the employer knew of her disability; (3) that a reasonable accommodation would permit her to perform the essential functions of the position; and (4) that the employer refused to make the accommodation." *Perdue*, 999 F.3d at 959 (citing *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)).  Defendant

does not dispute that Plaintiff satisfies the first three elements. (*See* ECF No. 60-1, at 6-14).  She suffered from equinus and Achilles tendonitis, (ECF No. 60-3, at 122), Defendant knew of these disabilities at least as early as 2019, (*id.* at 118-22), and an accommodation permitting Plaintiff to "wear flats/good support shoes instead of heels" would allow her to perform the essential functions of a cocktail server, (ECF No. 60-2 ¶ 19).

At issue is the fourth element, whether Defendant refused to provide Plaintiff a reasonable accommodation.  The ADA offers a non-exhaustive list of reasonable accommodations, including "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9)(B).  The United States Court of Appeals for the Fourth Circuit recently articulated a series of principles to guide the reasonable accommodation inquiry:

> [W]e have observed that "the range of reasonable accommodations is broad," a truth reflected by the ADA's text, which is "illustrative rather than exhaustive." *Elledge*[ *v. Lowe's Home Ctrs., LLC*], 979 F.3d [1004,] 1011 [(4th Cir. 2020)].  We have further explained that "what counts as a reasonable accommodation is not an *a priori*

16

matter but one that is sensitive to the particular circumstances of the case." *Id.* Finally, we have noted that "what will serve as a reasonable accommodation in a particular situation may not have a single solution, but rather, many possible solutions." *Id.* For that reason, an employer is not necessarily required to "provid[e] the exact accommodation that the employee requested." *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415 (4th Cir. 2015). To the contrary, where "an employee may be accommodated through a variety of measures, the employer, exercising sound judgment, possesses the ultimate discretion over these alternatives." *Elledge*, 979 F.3d at 1011 (cleaned up). And as long as the employer's chosen accommodation is reasonable, even if not perfect, our inquiry is at an end—"not even a well-intentioned court may substitute its own judgment for the employer's choice." *Id.* at 1012; *see also Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 433 (4th Cir. 2015) (stating that the ADA "requires a 'reasonable' accommodation, not a perfect one").

*Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 166–67 (4th Cir. 2024) (footnote omitted); *see also Perdue*, 999 F.3d at 960 n.3 ("[I]t is true that rejecting another reasonable accommodation would defeat her reasonable-accommodation claim." (citation modified)).

Moreover, "[i]mplicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." *Haneke v. Mid-Atl. Cap. Mgmt.*, 131 F.App'x 399, 400 (4th Cir. 2005) (citing 29 C.F.R. § 1630.2(o)(3)). As the Fourth Circuit has observed:

17

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.  A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.   In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F.App'x 314, 323 (4th Cir. 2011) (unpublished table decision) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135–36 (7th Cir. 1996)).   "Ultimately, 'an employer cannot be held liable . . . where it is the employee who refuses to engage in, or causes the breakdown of, the requisite interactive process.'"   *Stewart v. Ross*, Nos. 16-cv-213 & 18-cv-1369, 2020 WL 1907471, at *14 (E.D.Va. Apr. 17, 2020) (quoting *Maubach v. City of Fairfax*, No. 17-cv-921, 2018 WL 2018552, at *5 (E.D.Va. Apr. 30, 2018)) (citing *Allen v. City of Raleigh*, 140 F.Supp.3d 470, 490 (E.D.N.C. 2015)).

Defendant argues that it granted Plaintiff the sole accommodation she requested, it was not required to permit her preferred application of that accommodation (the Skechers), and Plaintiff broke down the interactive process.  The burden is thus on Plaintiff to "designate 'specific facts showing that there is

18

a genuine issue for trial'" on the fourth element. *Celotex*, 477 U.S. at 324 (quoting former Fed.R.Civ.P. 56(e)). Plaintiff attempts to raise genuine disputes of material fact in response to each of Defendant's arguments, but to no avail. Defendant thus prevails on the failure-to-accommodate claims.

The first two arguments are related and will be considered together. Plaintiff offers three purportedly genuine disputes of material fact: (1) whether sneakers, including her Skechers sneakers, were included in the 2019 accommodation; (2) whether Defendant narrowed or revoked the 2019 accommodation in December 2021 to exclude sneakers; and (3) whether Defendant received Plaintiff's April 2022 doctor's note specifically identifying sneakers as an accommodation before terminating Plaintiff.[4] (ECF No. 64, at 8-9). It is true that the parties dispute whether the 2019 accommodation permitting Plaintiff to "wear flats/good support shoes instead of heels" included sneakers, (ECF Nos. 60-2 ¶ 19; 64, at 5), and thus whether the December 2021 email prohibiting Plaintiff from wearing a "sneaker-like shoe" operated

---

[4] Plaintiff indicates that the timing of receipt of the doctor's note raises a genuine dispute regarding notice, the second element of a failure-to-accommodate claim. (ECF No. 64, at 9). The notice requirement, however, pertains to a plaintiff's disability, not her requested accommodation. Defendant was undisputedly on notice of Plaintiff's disability since 2019. Therefore, the doctor's note raises no genuine dispute regarding notice.

to narrow her accommodation, (ECF Nos. 60-2 ¶¶ 24, 26; 64, at 5).[5] But the first dispute is not material, and the second is not a dispute at all.  Even assuming that the 2019 accommodation did permit Plaintiff to wear sneakers, which she undisputedly wore for the following two years, (*see* ECF No. 60-2 ¶¶ 21-23), Defendant was not permanently locked into that particular application of the accommodation it had granted.  "To the extent [Plaintiff could] be accommodated through a variety of measures, [Defendant], exercising sound judgment, possesse[d] 'ultimate discretion' over these alternatives."  *Elledge*, 979 F.3d at 1011 (citing 29 C.F.R. app. § 1630); *cf. Bourke v. Collins*, 142 F.4th 918, 923 (7th Cir. 2025) (rejecting the plaintiff-appellant's proposed rule that "[a]ny time an employer alters an accommodation, for any reason, the employer must show an undue hardship" because it "would strip employers of their power over accommodations" (citation modified)).  Accordingly, whether the 2019 accommodation included sneakers has no effect on "the outcome of the suit" after Defendant

---

[5] Although Plaintiff contends that the December 2021 email may have *revoked* her accommodation, nothing in the record supports that view.  Her 2019 accommodation was not to wear sneakers specifically, but rather to wear flat, supportive shoes.  (ECF No. 60-3, at 136).  There was no sneaker-specific accommodation to revoke.  And the December 2021 email continued to permit Plaintiff to wear "flat dress shoes" rather than heels, so her accommodation was not revoked wholesale.  (*Id.* at 138).

clarified and/or narrowed it in December 2021 and is thus immaterial.  *Libertarian Party*, 718 F.3d at 313.

Plaintiff's grievance with the December 2021 email raises not a factual but rather a legal question: whether Defendant was permitted to exclude sneakers expressly from Plaintiff's accommodation.  Defendant represents that the new management hired for the Beverage Department wished to enforce higher professional standards.  (ECF No. 60-2 ¶¶ 26-27).  It was entitled to remove sneakers from Plaintiff's accommodation provided that an alternative form of footwear remained an effective accommodation.  Plaintiff, however, has not come forward with any evidence that the "flat dress shoe" accommodation was ineffective.  Instead, she almost exclusively relies on statements from the undersigned's prior summary judgment opinion in this case, with no heed to the fact that the burdens have flipped and the record has changed.  That is not enough.

Finally, the dispute about when Defendant received the April 22, 2022, doctor's note is immaterial.  Even if Defendant received the doctor's note before it terminated Plaintiff, it indisputably received it over a month *after* Plaintiff accumulated the numerous disciplinary actions that supported her termination.  Therefore,

21

Plaintiff's termination would be justified regardless of when Defendant received the doctor's note.[6]

In short, Plaintiff offers little more than a complaint that Defendant did not continue to "provid[e] the exact accommodation that [she] requested." *Reyazuddin*, 789 F.3d at 415.   Without evidence that the "flat dress shoe" accommodation was ineffective, the court is left to conclude that Plaintiff "reject[ed] another reasonable accommodation," which "defeat[s] her reasonable-accommodation claim." *Perdue*, 999 F.3d at 960 n.3.

Plaintiff tries one other tack to save her failure-to-accommodate claim, asserting that there is a genuine dispute of material fact about whether and how the interactive process broke down.   Given that "the interactive process is an ongoing process that often continues even after an initial accommodation has been granted," *Stewart*, 2020 WL 1907471, at *14 (citing, inter alia, *Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019)), it may well be that when Defendant notified Plaintiff she could no longer wear sneakers, a requirement to engage anew in the interactive process and agree upon a footwear solution was triggered, *cf. Brown v.*

---

[6] The doctor's note itself does not require that Defendant permit Plaintiff to wear sneakers.   The note requests that Plaintiff be allowed to wear "[Skechers] like soft top shoes without a heel and/or similar style to them."   (ECF No. 60-3, at 181).   It is quite possible that a soft-top, professional shoe exists that would be amenable to Defendant.   Plaintiff offers no evidence otherwise.

*Smith*, 21 F.Supp.3d 974, 982 (S.D.Ind. 2014) ("[T]he City's obligation under the [ADA] was to work with Mr. Brown to adjust the existing accommodation in an attempt to correct [its] problems, not withdraw the accommodation completely to his detriment." (citation modified)). Defendant did re-engage Plaintiff in the interactive process, holding three meetings with her between January and March 2022 and repeatedly delaying her compliance deadline. Plaintiff contends that "[t]hose meetings do not establish good faith as a matter of law; they underscore a factual dispute about whether Defendant sought a workable solution or simply used 'shoe standards' as a disciplinarian tool" to break down the interactive process. (ECF No. 64, at 9).

Plaintiff fails to dispute key facts regarding the 2022 meetings. She does not dispute that at the February 2022 meeting, Mr. Mulholland offered that Ms. Johnson could help Plaintiff pick out compliant shoes, and that they would give her the opportunity to have her doctor look at the shoes they select. (ECF No. 60-3, at 160–61). She also does not directly dispute that at the March 4, 2022, meeting, she indicated that she had found compliant shoes and agreed to a March 11 deadline to have her doctor approve them. (*Id.* at 167–68). The most she musters is a possibly conflicting assertion in a declaration by Ms. Kerr, the Shop Steward who accompanied Plaintiff to the meeting. But Plaintiff does not

23

specifically refer to this declaration in her argument regarding the interactive process.    Instead, in the final line of her argument, she asks the court to take notice of the five exhibits she attaches, one of which is Ms. Kerr's declaration, "as relevant material exhibits which dispute Defendant's version of events and give rise to disputes of material facts."   (ECF No. 64, at 19 & n.2).    It is, however, *Plaintiff's* burden to come forward with *specific* facts, not the court's burden to sift through her exhibits to find them.

Nonetheless, having found this assertion in Ms. Kerr's declaration, the court will address it.   She states, presumably in reference to the March 4 meeting, that "Mr. Mulholland required [Plaintiff] to return to her doctor and get new paperwork to re-establish her need for an ADA accommodation.   Mr. Mulholland tried to force [Plaintiff] to obtain paperwork by certain dates and she explained she was unable to agree to those deadlines until she visited her doctor."   (ECF No. 64-2, at 1).   Although she does not directly contradict Defendant's account of the meeting, her account raises the possibility that Mr. Mulholland asked Plaintiff to go to the doctor to complete new paperwork to support her wearing of sneakers, rather than ask her to go to the doctor to get his approval of the compliant shoes she had found.   Even taking Ms. Kerr's account as accurate, it does not raise a material

24

dispute.  Plaintiff's insistence that she be permitted to wear sneakers after Defendant forbade them under her accommodation effectively rendered her requested accommodation one for sneakers rather than any flat, supportive shoe.  Defendant was thus entitled to request "medical documentation that . . . 'substantiates why the requested reasonable accommodation is needed.'"  *Teel*, 2024 WL 1075421, at *5 (quoting *Rowlett v. Balt. City Police Dep't*, No. 21-cv-1205-BPG, 2023 WL 2664232, at *9 (D.Md. Mar. 28, 2023)).  Defendant was further entitled to impose a deadline on the submission of that documentation, and Plaintiff's "failure to provide such documentation [by that deadline] constitutes a failure to participate in th[e] investigatory process that bars an employer's liability for failure to accommodate."  *Id.* (quoting *Rice v. HAR-CO Credit Union*, No. 13-cv-3368-RDB, 2014 WL 4686669, at *4 (D.Md. Sep. 17, 2014)) (citing *Ahmed v. Salvation Army*, No. 12-cv-707-CCB, 2012 WL 6761596, at *9 (D.Md. Dec. 28, 2012)).  Ms. Kerr does not identify the date of any deadline that differs from the March 11 deadline identified in Defendant's exhibits.  Thus, Plaintiff had a week to get additional documentation from her doctor supporting her sneakers accommodation (after nearly three months of being on notice of the prohibition on sneakers) and she failed to do so until April 22, 2022, at the earliest.  Plaintiff is responsible for the breakdown of the interactive process.

In further support of the conclusion that Plaintiff broke down the interactive process, there is no evidence in the record that once Defendant started disciplining her, she requested additional time to see her doctor or notified Defendant that she had a doctor's appointment scheduled for April 22. In her deposition, Plaintiff stated that "[Mr. Mulholland] was aware that [she] was to see [her] physician first," and she "didn't change [her] shoes" while being disciplined "because [she] wasn't going to be forced or bullied to do all of this." (ECF No. 60-4, at 31). But Mr. Mulholland had set a deadline, too, which Plaintiff had missed and evidently failed to explain. "A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Crabill*, 423 F.App'x at 323 (quoting *Beck*, 75 F.3d at 1135). Plaintiff's failure to communicate once Defendant began disciplining her only exacerbated the breakdown of the interactive process.

Because Plaintiff has failed to generate a genuine dispute of material fact as to whether Defendant refused to accommodate her, the "inquiry is at an end." *Tartaro-McGowan*, 91 F.4th at 167. Defendant will be granted summary judgment on the failure-to-accommodate claims in Counts I and II.

26

**B.    Disability Discrimination Claims (Counts III & IV)**

To establish a *prima facie* case of disability discrimination, the plaintiff must prove: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."  *Thomas v. City of Annapolis*, 851 F.App'x 341, 345 (4th Cir. 2021) (citing *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom.*, *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012); *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001)).  On an employer's motion for summary judgment, whether the plaintiff employee can make out a *prima facie* case need not be decided where she "suffered an adverse employment action and [the] employer has asserted a legitimate, non-discriminatory reason for the decision."  *EEOC v. Mfrs. & Traders Tr. Co.*, 429 F.Supp.3d 89, 121 (D.Md. 2019) (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (Kavanaugh, J.)).  When those conditions are met, the court need only resolve "one central question," whether the plaintiff employee has "produced sufficient evidence for a reasonable jury to find" that the asserted reason is pretextual and "that the employer intentionally discriminated against the employee on the basis of [a protected classification]."  *Id.* (alteration in original) (quoting *Brady*, 520 F.3d at 494).

27

In her complaint, Plaintiff alleges six adverse actions: being mocked and screamed at by her supervisors regarding her disability and accommodation requests, demotion, denial of promotion, disciplinary actions for wearing sneakers, placement on WDI, and termination. (ECF No. 1 ¶¶ 95–99). Regarding the first three alleged adverse actions, Defendant disputes that they occurred or that they rise to the level of an adverse action and attacks Plaintiff's *prima facie* case. (ECF No. 60-1, at 15–18). Accordingly, the inquiry for these claims begins with Plaintiff's *prima facie* case. As for the latter three adverse actions, Defendant does not dispute that they occurred, but offers a legitimate, nondiscriminatory reason for them, namely that Plaintiff "refused to comply with [Defendant's] Appearance Standards Policy despite numerous opportunities to do so." (*Id.* at 19). Therefore, the analysis of these claims is limited to whether Plaintiff has produced sufficient evidence that Defendant's asserted reason is pretextual. The latter, undisputed adverse actions will be addressed first.

Regarding the undisputed adverse actions of discipline, placement on WDI, and termination, Plaintiff fails to show by a preponderance of the evidence that Defendant's legitimate, nondiscriminatory reason was pretextual. To show pretext, Plaintiff relies on generalizations like "shifting enforcement,

discretionary approval practices, and disputed managerial authorization," (ECF No. 64, at 17), the supposed departure of "Defendant's conduct . . . from its own stated policies," (*id.* at 8), as well as Plaintiff's "work history, the existence of a long-standing accommodation, and the timing and context of disciplinary actions tied to footwear compliance," (*id.* at 16).  Plaintiff's pretext arguments presuppose a premise already debunked above, namely that Defendant was not entitled to adjust Plaintiff's accommodation.  Plaintiff has offered no evidence that the accommodation Defendant provided in December 2021 was incompatible with the Appearance Standards Policy.  Thus, there is no evidence that Defendant disciplined Plaintiff, placed her on WDI, or terminated her because of her disability rather than because she failed to conform her accommodated footwear to the Appearance Standards Policy.  Her disability discrimination claim as to these adverse actions therefore fails on the third step of *McDonnell Douglas*.

The disputed adverse actions require greater discussion. Beginning with the alleged mocking and screaming, Defendant argues that Plaintiff fails to substantiate these allegations with any evidence, and that in any event, Plaintiff does not articulate how the mocking and screaming rise to the level of adverse action.  As noted in the previous section, Plaintiff gestures broadly at five

29

exhibits to raise disputes of material fact, rather than point to specific facts within those exhibits. Even so, upon reviewing the record, two of the declarations Plaintiff attaches contain pieces of evidence that stand out as relevant. Ms. Kerr states in her declaration that "Assistant Manager Johnson would chase [Plaintiff] . . . around the casino floor and yell at [her] about [her] accommodations in front of coworkers and customers." (ECF No. 64-2, at 1). Jessica Capers, who was a cocktail server at MGM at the same time as Plaintiff, says in her declaration that at the potluck, she "heard Manager Johnson and Director Farruggio tell [Plaintiff], 'you're not crippled.'" (*Id.* at 6). Therefore, Plaintiff does attempt to substantiate her allegations with some evidence. Still, she entirely fails to explain how this conduct by her supervisors affected a term, condition, or privilege of her employment, 42 U.S.C. § 12112(a), such as by arguing that the conduct was so severe or pervasive that it constituted harassment, *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001) (citing *Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999)). As a result, Plaintiff has failed to show the materiality of the disputed facts. Her *prima facie* case fails as to this alleged adverse action.

Next is the demotion claim. Defendant contends that Plaintiff cannot have been demoted from Star Trainer because Star Trainer is a type of shift rather than a position. (ECF No. 60-1, at 16).

30

Plaintiff does not dispute that Star Trainer is a shift rather than a position, (ECF No. 60-4, at 3-4), but appears to believe that lack of access to Star Trainer shifts, which provided double pay, did constitute a demotion.  Because the ADA bars discrimination "in regard to . . . employee compensation," 42 U.S.C. § 12112(a), Plaintiff is likely correct that depriving her of Star Trainer shifts for which she would otherwise be eligible can constitute an adverse action.[7]  The problem is that Plaintiff has not come forward with any record evidence that Defendant stopped giving her available Star Trainer shifts.  Without any facts or evidence that Defendant stopped giving Plaintiff Star Trainer shifts, when Defendant did so, and why Defendant did so, Plaintiff cannot establish that she suffered an adverse action.[8]  Her *prima facie* case fails for this alleged adverse action.

---

[7] Plaintiff's testimony is somewhat unclear as to how Star Trainer shifts affected cocktail server compensation in practice. Although base pay doubled under Star Trainer shifts, Plaintiff suggested in her deposition that the server would have to split her tips with the trainee.  (ECF No. 60-4, at 4).  As a result, Defendant was "pretty much begging other people" to sign up for Star Trainer shifts "because nobody wanted to be a [S]tar [T]rainer anymore."  (*Id.*).

[8] Plaintiff also does not identify any similarly situated, non-disabled cocktail server who continued to receive Star Trainer shifts, as the fourth element of her *prima facie* case would typically require.  She contends, however, that "[c]omparator evidence is not required in every ADA discrimination case."  (ECF No. 64, at 17).  While that is true, she still must "present evidence that reasonably creates an inference of an unlawfully discriminatory motive." *Noonan v. Consolidated Shoe Co.*, 84 F.4th

31

As to the denial of promotion, however, Plaintiff's disability discrimination claim survives.  A failure-to-promote claim is a particular type of discrimination claim with somewhat differently phrased elements than those of a standard disability discrimination claim.  To prove failure to promote, a plaintiff must establish: "'(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [her employer] rejected her application under circumstances that give rise to an inference' of liability."  *Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022) (alteration in original) (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 & n.5 (4th Cir. 2004)) (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959–64 (4th Cir. 1996)).  Plaintiff does not bring a standalone failure-to-promote claim; instead, she attempts to bring it under the general disability discrimination rubric.  (*See* ECF No. 1 ¶¶ 98, 111).  In any event, the "ultimate question [is] discrimination *vel non*," *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294–95 (4th Cir. 2010) (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)), and the *prima facie* case simply serves to help the court assess

---

566, 573 (4th Cir. 2023).  Because Plaintiff fails to substantiate if and when she stopped receiving Star Trainer shifts, she necessarily fails to offer other evidence that the withdrawal of Star Trainer shifts was discriminatory.

whether there is "enough evidence to support an inference of discriminatory motive." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025) (citing *McDonnell Douglas*, 411 U.S. at 802). That general benchmark thus guides the analysis below.

Plaintiff alleges, and asserts in her deposition testimony, that Ms. Johnson told her not to apply for an open position in the High Limits area because she would need to wear high heels there. (ECF Nos. 1 ¶ 57; 60-4, at 37).  Defendant makes four arguments in its motion for summary judgment: (1) Plaintiff did not actually apply for the High Limits position, (2) she relies only on her self-serving testimony, (3) she does not explain why she believed her accommodation would not travel with her, and (4) she does not identify any similarly situated, non-disabled cocktail server who was either promoted or encouraged to apply.  (ECF No. 60-1, at 16–18).  Plaintiff responds with no evidence other than Ms. Casper's declaration that Ms. Casper applied for a High Limits position but was told she could not be promoted because of her disability and accommodation.  (ECF No. 64-2, at 6).

Despite Plaintiff's thin response, Defendant's arguments are unpersuasive.  First, even though Plaintiff did not apply to the High Limits position, "a plaintiff who has failed to apply for a job may still carry his burden of proof if he can demonstrate that 'he would have applied but for accurate knowledge of an employer's

33

discrimination and that he would have been discriminatorily rejected had he actually applied.'" *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998) (quoting *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451 (4th Cir. 1990)). Plaintiff explained in her deposition: "I was told not to apply because, again, I couldn't because I had to wear high heels. So why would I apply when you're already telling me, 'Don't do it because you're not going to get selected. Somebody under you will.'" (ECF No. 60-4, at 37). Plaintiff's testimony suggests that she would have applied but for Ms. Johnson's potentially discriminatory dissuasion, and that it is possible she would have been discriminatorily passed over for someone with inferior qualifications. Second, because Plaintiff was a party to the conversation with Ms. Johnson, her self-serving testimony about what Ms. Johnson said suffices to create a genuine dispute of material fact. *Parker v. Homesite Ins. Co.*, No. 21-cv-2906-JRR, 2025 WL 254550, at *5 (D.Md. Jan. 21, 2025) ("[T]estimony that is based on personal knowledge or firsthand experience can constitute evidence of disputed material facts, even if it is uncorroborated and self-serving." (quoting *Evans v. Schultz*, No. 22-cv-3073-ELH, 2024 WL 3568569, at *6 (D.Md. July 29, 2024) (citing *Harrell v. DeLuca*, 97 F.4th 180, 187 (4th Cir. 2024)).

34

The third and fourth arguments likewise falter.  Whether it was reasonable to believe that Plaintiff's accommodation would not travel with her, and whether there is evidence of discriminatory motive via comparators or otherwise, *Noonan v. Consolidated Shoe Co.*, 84 F.4th 566, 573 (4th Cir. 2023), depend on whether Ms. Johnson knew at the time she told Plaintiff not to apply that Plaintiff had a footwear accommodation.  This fact is not clear from the record.  Plaintiff stated in her deposition that at the December 2021 potluck, Ms. Johnson represented that she did not know Plaintiff had an accommodation, even though Ms. Johnson had been with MGM "forever."  (ECF No. 60-4, at 16).  Plaintiff does not specify whether Ms. Johnson told Plaintiff not to apply to the High Limits position before or after the December 2021 potluck. It is possible, then, that Ms. Johnson told Plaintiff before December 2021 not to apply, and that she did so without any knowledge that Plaintiff had an accommodation.  Because Plaintiff is the nonmoving party, however, the court will draw the inference in her favor that Ms. Johnson told her not to apply at a time when Ms. Johnson knew Plaintiff had an accommodation.  *Ballengee*, 968 F.3d at 349 (citing *News & Observer Publ'g Co.*, 597 F.3d at 576).  Therefore, it is reasonable to infer from Ms. Johnson's statement

that Plaintiff's accommodation would *not* travel with her.[9]   And Ms. Johnson's statement coupled with her inferred knowledge supplies evidence of discriminatory motive.   Because Defendant offers no legitimate, nondiscriminatory reason for Ms. Johnson's statement, it does not rebut the "presumption of illegal discrimination" that Plaintiff's *prima facie* case creates.   *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). Plaintiff's disability discrimination counts survive as to the failure-to-promote component.

Defendant's motion for summary judgment will be denied in part as to the failure-to-promote component of Counts III and IV and granted in part as to the remainder of Counts III and IV.

### C.    Retaliation Claims (Counts V & VI)

To establish a *prima facie* case of retaliation under the ADA (and the MFEPA), a plaintiff must show: "(1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action." *Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021) (citing *Rhoads*, 257 F.3d at 392).   A plaintiff can show causation through relevant facts, temporal proximity alone if the

---

[9] Ms. Capers' declaration specifically states that she was told by Ms. Johnson that she could not be promoted to High Limits because of her disability and ADA accommodation.   (ECF No. 64-2, at 6).

adverse action is "very close" in time to the protected activity, or otherwise temporal proximity in conjunction with relevant facts. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123, 127 (4th Cir. 2021) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). The *McDonnell Douglas* burden shifting proceeds as it does for disability discrimination claims. *See Smith*, 12 F.4th at 416.

Plaintiff alleges the following as protected activities: "complain[ing] of disability discrimination, failure to accommodate, and retaliation to her supervisors at MGM, Human Resources, employee relations, and her union representatives," and "requesting a reasonable accommodation under the ADA." (ECF No. 1 ¶¶ 117–19). She alleges all the same adverse actions as in her disability discrimination claims, plus the allegation that Defendant "required her to wear a uniform with holes in it[,] subjecting her to unwanted sexual attention from customers." (*Id.* ¶¶ 120–22). Defendant moves for summary judgment on the basis that Plaintiff has failed to allege any adverse action causally connected to Plaintiff's protected activity. (ECF No. 60-1, at 19–21).

None of Plaintiff's retaliation claims may proceed; some fail on the *prima facie* case, whereas others fail on the burden to show pretext. Beginning with the adverse action element of the *prima*

37

*facie* case, Plaintiff does not explain how her supervisors' alleged mocking of her rises to the level of an adverse action in the retaliation context, nor does she offer evidence of demotion. At the causation element, Plaintiff's failure-to-promote and tattered-dress claims falter. Plaintiff does not situate the failure to promote in the timeline of events in a way that permits assessment of temporal proximity, nor are there any other facts specifically tying the failure to promote to Plaintiff's protected activity. And although the parties seem to dispute whether Plaintiff was required to wear a dress that developed holes in it, (ECF Nos. 60-1, at 20; 60-4, at 28), Plaintiff herself affirmed in her deposition that the purported requirement that she wear a dress with holes in it "had nothing to do [with] her shoes" and rather was "just [Ms. Johnson] being mean," (ECF No. 60-4, at 28). Finally, concerning the disciplinary actions, placement on WDI, and termination, Defendant offers the legitimate, nondiscriminatory reason that Plaintiff refused to conform her footwear to the Appearance Standards Policy. (ECF No. 60-1, at 21). As with the disability discrimination claims, Plaintiff does not make any showing that Defendant's proffered reason is pretextual.

Defendant will be granted summary judgment on Plaintiff's retaliation claims.

38

## IV.  Conclusion

For the foregoing reasons, MGM's motion for summary judgment will be granted in part and denied in part.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
